IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 21, 2025 Session

## JOSHUA MATTHEW BROWN v. KIMBERLY HIGGINBOTHAM BROWN

Appeal from the Circuit Court for Sumner County
No. 2023-CV-387    Joe Thompson, Judge
_____

### No. M2024-01179-COA-R3-CV
_____

This is an appeal from a final decree of divorce.  The parties were married over twenty years and had three children.  The mother was a stay-at-home parent while Father was employed.  At trial, they stipulated to separate parenting schedules for their two teenagers but could not agree on a parenting schedule for their youngest daughter, a former foster child they had adopted years earlier.  The trial court designated the father primary residential parent of the youngest daughter and adopted a parenting schedule with equal parenting time on an alternating weekly basis.  The trial court denied the mother's request for alimony in futuro and awarded her transitional alimony for a period of five months.  The trial court ordered the father to pay $6,000 of the mother's attorney fees, but each party was deemed responsible for the remainder of his or her own attorney fees.  The mother appeals.  We reverse in part, vacate in part, and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed in Part, Vacated in Part, and Remanded**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which KENNY W. ARMSTRONG and VALERIE L. SMITH, JJ., joined.

Russell E. Edwards, Hendersonville, Tennessee, for the appellant, Kimberly Higginbotham Brown.

Christopher Beauchamp and Thomas A. Maynard, Lebanon, Tennessee, for the appellee, Joshua Matthew Brown.

**OPINION**

# I. FACTS & PROCEDURAL HISTORY

Joshua Matthew Brown ("Father") and Kimberly Higginbotham Brown ("Mother") married in 2002 in Georgia. Father has a master's degree in educational management, issue, and policy; and Mother has a master's degree in literacy. Early in the marriage, Father worked for an educational publishing company, while Mother worked as a teacher in Georgia. In 2006, the parties adopted a newborn son, Noah. They agreed that Mother would stay home to care for Noah and no longer work outside the home. Mother gave birth to the parties' second child, Anna, in 2008. At some point, the family moved to Tennessee, and Father began working for the Lebanon Special School District in 2011. Noah and Anna attended public school for a year or two before the parties decided that Mother would homeschool the children.

In 2015, Father and Mother began serving as foster parents to another newborn child, Lasa. They eventually adopted Lasa, just before her third birthday. The parties agreed to send Lasa to a public school because she is African-American, and they wanted her to have a diverse school environment. They lived in Bethpage in Sumner County and sent Lasa to Benny Bills Elementary School in Gallatin. Father remained employed by the school district in Lebanon, where he worked 8:00 a.m. to 4:00 p.m. However, his commute was 38 minutes, so he typically left between 6:30 and 7 a.m. and arrived home between 4:40 and 5:20 p.m., although sometimes it was later. His salary was $102,500.

After twenty years of marriage, in March 2023, Father announced to the family that he wanted a divorce. He filed his complaint for divorce in April. Mother filed an answer denying that grounds for divorce existed or that the parties should be divorced. The divorce trial was held over the course of two days in December 2023 and January 2024. Thus, the divorce proceeding had been pending for just seven months when trial began. At the outset, Father's counsel informed the judge that the two older children had essentially "chosen a parent" – "Noah has chosen his father, Anna has chosen her mother." However, all of the family members were still residing together in the marital residence. The parties stipulated to the divorce, a "50/50" division of the marital estate, and to a schedule for the two older children. The parenting plan and child support worksheet would provide that Anna (age 15) resided with Mother 233 days and Father 132 days and that Noah (age 17) resided with Father 233 days and Mother 132 days. Ultimately, however, the parents agreed to respect the wishes of the teenagers on how much they actually visited the other parent. The primary issues left for determination were the parenting schedule for eight-year-old Lasa; alimony; and attorney fees. However, the trial judge agreed to hear evidence regarding parenting issues concerning the older children to the extent that it was relevant to determining a parenting schedule for Lasa. Father proposed an alternating weekly schedule for Lasa with the parties designated joint primary residential parents, while Mother proposed that Lasa primarily reside with her, having parenting time with Father every other weekend and every Thursday night.

The trial court heard testimony from Father, Mother, and Anna. Father was 45 years old. He testified first regarding Noah. Father explained that the relationship between Mother and Noah had become "pretty rocky, here recently especially." In the last couple of weeks, Mother had sent Father a message stating that Noah had become "defiant, disrespectful, and disgusting" and that she believed it was unsafe for him to be alone with their daughters. She informed Father that Noah was becoming "more aggressive, threatening, AND deceitful in hiding it and taking advantage when there is no parent around." Father testified that he did not agree with Mother's opinion that Noah was unsafe to be around the other children. He was also asked if he recalled Mother referring to Noah as a "cheater" and "liar" during her deposition and whether he agreed with those statements. Father admitted that "[Noah has] had some times where that's been a struggle for him." Still, he said he did not think it was fair to "characterize him as a liar and cheater." He testified that Noah had been "struggling" but that he had encouraged him to respect and love Mother. Father said that Mother has "a tone that makes Noah uncomfortable" and that she yells at the children "maybe once or twice a week." He said that Mother uses a "very loud raised voice that Noah describes as yelling and so do I." He said he encourages the relationship between Noah and Mother and tells Noah to approach their conflict calmly.

Next, Father testified regarding Anna. He said that he and Anna had a very close relationship before he filed for divorce. He explained that in the first couple of weeks after the divorce was filed, they were "all in shock" but still talking and spending time together, but then the situation changed and Anna had communicated with him very little since. Father testified that Anna responded to a few text messages "early on" when he reached out, but he had tried sending notes to Anna and that she had not responded to those. He estimated that anytime the family members were all in the marital home at the same time, Anna spent "probably 95 percent of the time" in Mother's bedroom with her. He said "a lot of times" Anna will communicate things to him through Mother. He admitted, however, that Anna had asked him a few things directly lately and "kind of expressed where she is in this difficult time." When asked if Mother encourages Anna to communicate with him, Father said, "I do not think so because a lot of the things that she would normally come tell me, she doesn't, and [Mother] is the one that communicates that." Father was then asked, "Do you know if [Mother] has communicated this matter with Anna?" He responded, "I feel like, from the things that have been said, it sounds like there's been a lot communicated." The following exchange occurred between Father and his counsel:

Q.     . . . Has [Mother] told Anna what this divorce was and given her her opinion?
A.     I believe so.
Q.     Do you think that her mother's opinion has influenced Anna on how she treats you?
A.     Yes.
Q.     What does she say? You recall in her deposition she called it something. What did she call this divorce?

A. She's used wrong and unbiblical.

Father was asked if he believed Mother was encouraging a relationship with him and the children and said no. When asked if he thought Mother had "discouraged a relationship and maybe poisoned that relationship," he replied, "I believe so." Finally, Father was asked if he agreed with Mother's deposition testimony that it was Father who caused his relationship with Anna to change by filing for divorce. He replied, "It has changed dramatically. I know this is a very hard time, but I feel like that there's been influence." Still, he believed he could rebuild their relationship.

Next, Father testified about Lasa. He and Mother had been Lasa's foster parents, and Lasa had lived in their home her entire life with the exception of ten days. Father described his relationship with Lasa as "very tight." He said that, when he is at home, Lasa spends the "vast majority" of that time with him, and they love doing activities together. He described Lasa's daily schedule, stating that on weekdays she wakes up by 6:15 and gets ready for school independently, although Mother lays out her clothes for her. Father acknowledged that caring for Lasa's hair requires special techniques and that Mother had been the one primarily caring for Lasa's hair, but he had already purchased necessary products and had a salon appointment scheduled. Father testified that Mother takes Lasa to school four days per week and that he takes her on Thursdays. He said he had asked Mother recently if he could take Lasa to school on additional days, but she declined.

Father was asked to explain his plan for Lasa's schedule in the event the trial court granted his request for equal parenting time on an alternating weekly basis. He planned to take Lasa to school each morning during his week. Father said he was looking at rental properties in the school zone for Benny Bills Elementary. He explained that he would drop off Lasa at her elementary school at 7:00 a.m. in order to be at work in Lebanon by 8:00 a.m. He testified that he had enrolled Lasa in the after-school care program at Benny Bills Elementary and that she would need to stay there until 4:30 in the afternoons when he could get there after work. He acknowledged that Mother believed the after-school program was a terrible idea. Mother had picked up Lasa from school every day of the previous semester, and she wanted to continue to do so even on days when Father would have parenting time. However, Father testified that he believed the after-school program would be beneficial because it offered tutoring, and Lasa was struggling with her grades. He noted that Lasa had once attended a pre-K program at a school in his district and attended after-school care there until he could pick her up after work. Father testified that he also planned to enroll Lasa in a summer program in his school district because he would have to work six of the eight weeks of summer break, although he would have Fridays off during the summer.

Father conceded that Mother is a good mother to the children. However, his counsel asked him the following questions:

Q. Do you believe the deterioration of your relationship with Anna could

- 4 -

happen to Lasa?

A.  I do.

Q.  Okay. And that would have been from [Mother] talking to Anna and eventually talking to Lasa; is that right?

A.  That's right.

Q.  Do you believe that [Mother's] behavior is emotionally damaging or harmful to the children?

A.  Yes.

Q.  Do you think that would increase with you being out of the home and not having equal time with the children?

A.  Yes, I do.

Q.  Has [Mother] attempted to alienate you from Anna?

A.  I think so.

Father conceded that Mother had been "the primary caregiver" for all three children due to his work schedule. He testified that he expected Mother to enter the workforce and work full-time since the parties were divorcing. On cross-examination, Father conceded that although he only works four workdays during the summer, he works for an hour longer on those days. During the previous summer, for example, he had arrived at work in Lebanon at 7:00 a.m. Monday through Thursday. With his 24-mile commute, he left for work each morning during the summer about 6:20 a.m. He had no relatives nearby who would be available to help with childcare. Still, Father maintained that it was in Lasa's best interest to attend after-school care rather than being with Mother because it would provide "consistency" and she would not be going "back and forth."

Father's salary was $102,500. His monthly net income was $6,162.78, but he admitted this would soon increase because he would no longer have deductions for family coverage on insurance. He submitted an income and expense statement as an exhibit at trial, reflecting current monthly expenses of $5,478.01, leaving a monthly surplus of $684.77. However, he explained that this reflected current expenses for the entire family over the past year. Father had prepared a separate "Post-Divorce Budget" of expenses that he anticipated after the divorce. This document listed only $4,402.90 in post-divorce expenses (without child support). Still, when asked how much money he would have left each month to pay as far as spousal support, Father estimated "600 maybe." Father was asked how much spousal support he proposed should be awarded and responded, "I would very much like to see her reach full employment and see what I'm able to do to help." He noted that Mother had recently taken a job working about twenty hours per week and believed there was nothing preventing her from working forty. Finally, Father was asked "[w]hat do you think would be a fair length of time for you to have to pay her spousal support?" He said, "I think until Anna is done with high school."

Father testified that he and Mother did not currently communicate very often, even though they continued to live in the marital residence together, and they generally

communicated by text message.  He admitted it was "a hard environment at home."  He also admitted he understood why his family was not completely supportive of his decision to get a divorce.  Father testified that he had taught the children about faith and Christianity. He believed that his decision to seek a divorce was consistent with what he had taught his children and believed that divorce was acceptable because of "the environment we've been in."  He no longer attended the church where the family attended during the marriage, but Mother and the children did.  Father was also asked if he understood why Anna lost some trust in him because of the divorce.  He responded, "I understand this has been very difficult for all of them and especially for her."  He was asked if being divorced was more important than getting to see his children every day and said it was, adding, "That's what I needed to do."

Father testified that he had been seeing a counselor since 2021.  Prior to trial, the trial court had denied Mother's motion to compel Father to execute a release for his counseling records, as the trial court deemed them protected therapy records.  Father admitted at trial that he reacts differently than others when people express frustration and anger, as he "feel[s] like it's more intense" than what other people perceive, and it takes him longer than most people to calm down.[1]  He admitted that what he perceives as hostility

---

[1]  Father had written a letter to his parents explaining his issue with the following examples:

> . . . The first one is an experience from one of the last times I visited your house with all the kids. Daddy was on the phone with a customer service agent I think with an Internet provider. His voice was raised and he was being very unkind to the agent. There was an awkward silence at the kitchen table as we all listened to his part of the exchange. We tried to make light of it at the moment but it was uncomfortable. Noah still references that event sometimes.
>
> Next story. I think it was January and [Mother] was driving the car down the highway. Someone in front of her was driving slowly in the left lane and [Mother] expressed her frustration with the driver out loud with a frustrated, raised voice. There was an awkward silence in the car for a short while afterwards.
>
> Now, in both of those examples a normal person (so I have recently learned) might hear the anger or frustration of Daddy or [Mother], may or may not comment to them directly, might even talk to them about it in an effort to help them work through it, but would likely give them a short time or space to calm down and then move on with their day and normal interactions. What happens in me is sickness in my stomach, my pulse increasing, muscles tighten up, my mouth gets dry, and above all a desire to get away. So much so that this fight or flight reaction lasts for days afterwards. Three days to be specific. Whatever that abnormal reaction is that makes me want to get away from the person expressing a raised voice, frustration, or anger lasts for three days. Three days where I don't want to be in their presence, don't want to talk to them, and feel on edge and tense around them.
>
> Why do I react differently to anger than other people? Why do I react like that with expressions of anger, frustration, and raised voices? In the two very simple examples above the anger/frustration was not even directed toward me. In the countless memories I'm working through of when it was directed toward me the reaction and recovery time was about the same but with much greater intensity.
>
> This recognition is what I began working with my counselor on. Sara (my

or anger, from Mother or anyone else, might not seem hostile or threatening to others. Father testified that he believed Mother was emotionally abusive to Noah, but he admitted it was possible his perception of abuse might be different than someone else's. He testified that he had also been diagnosed with mild seasonal depression and that he had been taking an antidepressant seasonally from October through February since 2016. He said it had not impacted his ability to parent.

At the end of the first day of trial, on December 15, Mother informed the trial judge that she and Anna planned to move out of the marital home into a rental house owned by friends. The trial judge adopted a temporary parenting schedule for Lasa for the holiday break. When the trial resumed on January 24, Father testified regarding events that had transpired over the break. He testified that the plan for Christmas was for Noah to go to Alabama with Mother and his sisters to visit family, but a couple of days before, Noah "voiced" that he wanted to leave there midday and drive back to Tennessee to spend the night with him. Father testified that Noah's announcement "was met with a response from [Mother] that essentially said, just don't come at Christmas." He testified that it was his understanding of the parties' agreement that the older children would be able to visit each parent as he or she preferred. When asked if he believed Noah needed to apologize to his mother for the situation, Father said, "I could not understand what it was that needed an apology for, for him asking to spend Christmas day with both parents." [2]

Father testified about another incident that also occurred during Christmas break when Mother, Anna, and Lasa came to the marital residence to retrieve some items. Father knew they were coming beforehand and had set up security cameras that recorded them while they were there. He testified that he saw on the footage that Anna threw down a remote control while she was there, and when she saw the security camera, she unplugged it. He said he later learned that Anna took the key out of the "side-by-side" and threw it

counselor) calls it a trauma response.

Father wrote that he was "learning through counseling that anger is a normal human emotion, frustration is not the same as anger, and a raised voice does not always mean a person is angry."

[2]    Some of the parties' text messages about the issue were introduced at trial. In those messages, Mother stated that Noah was proposing to arrive in Alabama on Sunday and drive back by himself on Monday at lunchtime, and she stated that Noah was "being insensitive to the situation and dismissive and rude." Father said he had advised Noah to think about the decision overnight, but Mother responded, "Unfortunately, it's not his decision to make anymore. He's made them all uncomfortable and hurt and they don't want that energy there." She later added, "Neither do I." Her separate text message to Noah said that he had been "wrong headed and cold" toward a lot of people and that she expected him to send a sincere apology to their family members. Father asked Mother to call him to discuss the situation and stated that "[c]oparenting requires communication," but Mother responded by stating that it was "time you step up and actually actively parent without relying on me to always tell you what is going on." She stated that Noah had "defiantly" not answered her messages at Father's direction and that "nobody in that courtroom is going to believe your charade about helping him understand," stating Father had "stood in the way of communication." She explained that Noah had "called me pissy, childish, and whiny."

beneath a hot water heater.

Father testified that his communication with Mother had been okay aside from these two incidents. They had met with a realtor and handled financial issues in a civil manner. Father testified that he had "very little communication with Anna outside of text exchanges, group texts," and he bought her Christmas presents that she sent back unopened. In contrast, Father explained that things were going very well with him and Lasa and that she had adjusted well and started after-school care. Father testified that even though he proposed equal parenting time with Lasa, he wanted to be designated primary residential parent "[f]or educational purposes, just to be able to make decisions that we need to for her." He testified that he intended to move to Gallatin to the school district for Benny Bills Elementary when the marital home sold. His counsel submitted an amended proposed parenting plan changing the primary residential parent designation for Lasa from "Joint" to "Father."

Father's most recent paystub was submitted as an exhibit, which showed that his net income had increased to $6,301 per month. Mother was still covered under his insurance for the time being, so he admitted that his net income would increase again, by an additional $312 per month, once Mother was removed from his policies at the end of the month. Father also submitted a child support worksheet listing his monthly gross income at $8,541 and Mother's at $1,923, which would result in Father owing child support of $1,400 per month. He testified that if he was ordered to pay that much child support, he would not be able to afford spousal support. He introduced a separate child support worksheet with an alternative calculation, which imputed income to Mother at $2,994 per month and resulted in a reduced child support payment of $1,049. Father suggested that Mother was voluntarily underemployed. His counsel introduced as an exhibit a chart he had downloaded from the website of Sumner County Schools, displaying a pay scale for teachers. It indicated that a teacher with a master's degree and five years of service would earn $51,600. Father noted that he was going to be assuming the homeschool responsibilities for Noah and suggested that Mother could work full-time while homeschooling Anna.

Father testified the parties' home was valued at around $600,000, with a mortgage balance of $232,500, so any equity realized from the sale of the home could be split equally and/or used to pay any award of alimony or attorney fees he was required to pay to Mother in a lump sum. However, he asked the court to deny any alimony award, stating that money was going to be "very tight" if he was ordered to pay $1,400 in child support. Father testified that he had received raises over the years, but they were not guaranteed in the form of a pay scale like a teacher, and there had been a few years when he did not receive one. When asked if he understood that Mother would "never be able to earn close to what you're earning after the marriage," Father responded, "Right." But, he added, "If I look at that pay scale and we go even up to the 20, that can be an expectation." The exhibit reflected that a teacher with a master's degree would reach a maximum salary, after 25 years of

service, of $70,172. When asked if it was really his position that Mother should receive no alimony, Father testified that it depended on how much child support he had to pay, because if he was ordered to pay $800 versus $1,400, "that's a very different scenario of what I can pay a month," so "depending on where child support lands, I do think there could be hopefully some room to help, if that's you know, but it really depends upon the numbers." Father had withdrawn $6,000 from an IRA to pay a portion of his attorney fees.

Mother testified next. First, with respect to Noah, Mother acknowledged telling Father that she believed he was unsafe around his sisters. She explained that Noah had "threatened Anna" after becoming upset with her and that she had growing concerns about his safety when driving. She explained that one day in recent months Noah had "dropped Anna off a good distance from our house out in Bethpage because he just kind of gets on a power trip when he's in a car and there's no other adults there, so he's very bully-ish with her and apparently irresponsible with her, because he dropped her off on the side of a road and then went on with his friends." Mother had not allowed Noah to drive his sisters ever since. She described several other issues that had occurred during the divorce proceeding. Noah had been kicked out of a summer camp for taking a knife and trying to sell it. She objected to Noah going on a camping trip out-of-state with older coworkers until Father said he would go as a chaperone, but then Father left early, leaving Noah to ride home with a friend. Mother saw on Life360 they were driving almost 100 miles per hour. Mother explained that Noah had also been grounded from his vehicle for the majority of December due to driving while on his phone, even though he had been grounded for such behavior "[a]gain and again and again." When asked about her deposition testimony when she referred to Noah as a cheater and liar, Mother admitted that she still believed that, stating that he "is regularly dishonest and he has cheated at every opportunity he can get."[3] She had also stated during her deposition that "he can be a jerk," in the context of explaining why Noah would never commit to babysitting Lasa after school. Mother characterized the recent Christmas incident as another example in which "[h]im being rude was on display." She explained that she received a text message from Noah that was "so disrespectful and rude and dismissive and mocking." She believed Father stood in the way of her communication with Noah by instructing him not to respond. She also believed that Father's text messages about the incident were false and that he was "posturing" for screen shots about coparenting to use in court, while undermining her decisions on other matters. She explained that during the same month, in December, Father had unilaterally allowed Noah to spend the night with his birth parents, even though they were "known drug addicts" and Mother had opposed overnight contact in the past, and Father made no effort to coparent with her about that decision. Finally, she noted that Father had permitted Noah to work full-time instead of doing homeschool that month. Overall, Mother explained that

---

[3]     During her deposition, Mother had used the terms "cheater" and "liar" when asked if she had concerns about Noah's school performance if he was in Father's care, and Mother expressed her fear that Father would not hold Noah accountable. Mother testified that Noah requires more oversight in the homeschool program because he "will do as little as possible and he will cheat," noting that he will simply find answer guides and copy the answers.

she was responsible for disciplining Noah and that frequently made her "the bad guy in Noah's eyes." On the other hand, she described Father's approach to Noah over the last year as "let's just give Noah everything he wants." She said "[Father] ha[d] become [Noah's] 'yes' man" and gave him permission to do things he would not have before the divorce. She also testified that Noah had told her, "Dad says I only have to put up with you for two more months."

Mother also testified about Anna. When asked if she had encouraged the relationship between Anna and Father, Mother replied, "I've not gotten involved with that." She testified that Anna had "made her own decisions" and that she understood her decisions. According to Mother, on the day Father announced that he wanted a divorce, the family "sat down together, we talked about the rightness or wrongness of this before the Lord, how this is unbiblical." Thus, Mother acknowledged telling the children that this was "an un-biblical divorce." She added, "That's scripture." She noted that Father was in the room when this was discussed and "did not disagree." Mother explained that she characterized the divorce as unbiblical "[i]n scriptural opinion" and noted that "this is the opinion that [Father] has raised our family on too." She said they had attended church as a family for eleven years and that Father taught Sunday School there, although he had to step down from that position and stopped attending after he announced the divorce. Mother testified that Father was removed from the membership of their church "as a result of this unbiblical divorce."

Mother testified that after Father filed for divorce, "[Anna] was confused on how to proceed after that because she knows it's wrong and she knows it's not the man that he has purported to be for all her life." She explained that Anna "went through a few weeks of just almost disorientation" after Father said that he wanted a divorce, and Father continued to play with the children "like it's life as usual, when it's not[.]" She believed Anna did not know what to do at first but after a few weeks decided that "she didn't like what was going on," she did not like "his stance," and she "pulled away from him greatly." Mother testified that Father had not been able to answer Anna's questions about the divorce, and "it really upsets her that he won't answer her." She testified that there had been "whole family conversations" about the divorce when Father was present, and she acknowledged that she and Anna had also talked about the divorce separately, stating, "For sure. It's unavoidable." Mother was asked if she had discussed with the children "things that are going on with your divorce," and she said no. However, she acknowledged that she and the children had discussed logistical matters such as where they would live or attend school, stating "that's not a gag order topic, I wouldn't think."

When asked again if she had tried to "redirect" Anna and encourage the relationship between her and Father, Mother said, "No, I don't think I did. . . . I stayed out of it. I have honestly been in survival mode." Mother believed it was not her responsibility to encourage Father's relationship with Anna because it was his responsibility. She also said, "I don't think that's my responsibility to convince her to approve of something that she

- 10 -

doesn't want to -- that she knows to be wrong." She noted that Anna and Noah were teenagers and that the parties had agreed that "they will make their own choices," so she believed that also applied to how much Anna wanted to interact with Father. Mother said she had not relied on Father to help her navigate her relationship with Noah and that he had come to her house repeatedly since Christmas break. Mother testified that she believed Father was harassing Anna. She explained that he continued to go into her space when they were still living in the same house and left notes for her, even after Anna's counselor had told Father "to stay out of her space."[4] Mother testified that Father went through her trash and questioned things she had thrown away. She said he also "manipulated situations to try to make her be with him against her will," which resulted in Anna being "in tears and her fleeing." During her deposition, Mother testified that the last interaction she had observed between Anna and Father was a month earlier, when they had a disagreement about Father eating the eggs from their family chickens, which Anna sells. She said this was very upsetting to Anna and when "[Father] picked that fight with her, [] it didn't go well. It made her madder." She testified that since then Anna had been avoiding Father and "won't even make eye contact, honestly." Mother also testified that on the day when she and Anna went to retrieve items from the marital home, Father left presents on the porch for Anna, but Anna found the secret camera and it was "very upsetting for her." She said that Noah had texted after the incident and admitted that "we set this up to catch you." Mother said she told Anna that Father was probably trying to catch her on video rather than Anna, which she believed would relieve Father of some of the blame in Anna's view, but Anna "took it personally." Mother said she was not present in the room when Anna had thrown the remote or the key and did not know those things occurred, but once she learned about it, she was shocked and redirected her. Mother said she did not encourage that behavior.

Ultimately, Mother acknowledged that it is not healthy for a child to be without a parent, but at the same time, she noted that Anna currently did not trust Father, disagreed with him, and felt harassed by him. Mother testified, however, that she did not want to *limit* Anna's involvement with Father. She also testified that she was not going to *discourage* Anna from having a relationship with Father. She said she had even told Anna, "it's going to be okay if you feel differently later." Mother also testified that she had not spoken *negatively* about Father in front of the children, nor had she allowed anyone else to do so.

Mother admitted that, while they had remained living in the marital residence during the divorce proceeding, she had avoided Father and generally went into her bedroom once he got home from work, as it was terribly uncomfortable for her to be constantly in his

---

[4] Father had arranged for Anna to begin counseling sessions a couple of months before he filed for divorce, stating at the time that it would be beneficial in helping with sibling rivalry. He admitted during his deposition that he did this at least in part in anticipation of him filing for divorce, so that Anna would have a counselor in place once he made the announcement.

presence given his desire for the divorce. She admitted that Anna had avoided Father as well but said their actions were not "robotic" or "orchestrate[d]." She testified that it was "very much an exaggeration" to say that she and Anna were always in her bedroom, as Anna spent time in other places too, going outside or in her own room. She said Anna was currently a Sophomore, was doing great in school, and was a very gifted student.

As for Lasa, Mother admitted that Father had a good relationship with her and testified that she does encourage their relationship. She acknowledged that Father had asked, a few months earlier, about taking Lasa to school in the mornings two days a week rather than one. Mother had responded with a message stating, "No thanks. That's my job and I'd like to maintain our normal routine." Since the last trial date, Mother had moved into a home in Hendersonville, about 25 minutes away from Lasa's school. She was working part-time at another elementary school in Sumner County as a reading interventionist, from 8:00 a.m. to 1:00 p.m. She typically left in the mornings at 6:45 a.m. and drove Lasa to school in Gallatin, and Lasa's school lasted from 7:40 a.m. to 2:40 p.m. Mother was in favor of Lasa remaining at Benny Bills Elementary but opposed Father's plan to enroll her in after-school care. She testified that she would be available to pick Lasa up from school every day. Mother explained that her part-time work schedule was by design so that it worked with Lasa's schedule, and she said that it was Father who told her to find such a schedule when he pushed her to find a job in the last year. She wanted to continue picking Lasa up and said that arrangement would be in line with "what we've made an entire family lifestyle." Mother admitted that Lasa had attended an after-care program once before when she went to a pre-K program in Lebanon and rode with Father, but she said it was a "terribly long day" and that the parties only utilized it for one year. Mother questioned Father's statement that Lasa would only be staying at after-care at Benny Bills until 4:30 in the afternoons and stated that during the marriage he had a history of not getting home until 5:30 or 6:30 in the evenings. She noted that this would result in Lasa having a nine to ten-hour school day. She also noted that Father would be working an hour longer in the summer. Mother testified that Lasa's bedtime is typically 7:30 p.m. She said that since Father had enrolled Lasa in after-school care, there had already been one occasion where he picked her up late and had to take her back to work in Lebanon with him for a night meeting. Mother said it seemed "silly and mean-spirited" for Father to have Lasa in after-school care at an expense when she was available and wanted to spend the time with her.

Mother sought to be named primary residential parent of Lasa and proposed that she spend the majority of the time with her, visiting Father every other weekend and every Thursday overnight. She stated that her goal was to maintain stability and assurance for Lasa regarding where home was, with Mother continuing in the role of primary caregiver as she always had. She believed her plan would serve Lasa's best interest by providing her "steadiness and routine and structure." She testified that she hoped to shield Lasa from any further trauma of "breaking up" her life and wanted her to have a "home base" with Anna at her house. Mother stated, "Lasa already has a number of traumas under her belt.

The divorce adds another." However, she admitted that Lasa "still needs her father" and said she had already informed Father that she would have no problem with him exercising more time with Lasa than the official schedule adopted by the court.

Mother testified that, throughout the marriage, she had performed the majority of parenting responsibilities, handling school, doctor's appointments, transportation, laundry, discipline, social activities, "everything." She noted that during Father's deposition, he did not know the name of the medication Anna had been taking since age seven, what dentist the children see, or what size clothes Lasa wears, believing she wore size 10/12 when it was actually size 16, as she is very big for her age. Mother testified that Father was a "passive parent" before he filed for divorce and had become "hyper-engaged" since, which she believed was "for show" in an attempt to demonstrate his involvement to the court. Mother claimed that Father had gone "into overdrive playing with Lasa" since the divorce was filed, and she conceded that Lasa was enjoying all the attention and entertainment. However, she stated her concern that Father was "more of a playmate" and that Lasa needed a parent. She explained that the past six months had really been "a tough trial" with the divorce and Mother starting a new job, and Lasa was struggling with math. However, she testified that she and Lasa had "buckled down" and did a lot of work on math during Christmas break, so that she was "evening out this new semester" and "grinning with confidence again."

Mother also believed it would serve Lasa's best interest to live primarily with her and Anna given issues that would be arising with puberty. Anna and Lasa had shared a bedroom for several years. Mother testified that Anna and Lasa were "really close" and had gotten closer during the divorce proceeding. She said she had never asked Lasa what she wanted, but Lasa had "offered up that she wants to be with me -- on more than one occasion." Mother testified that if the trial court ordered the alternating weekly schedule "[w]e'd survive it," but she did not think it was in Lasa's best interest to be going back and forth every week, noting that it would be difficult to plan extracurricular activities if she was spending a week at each house. She wanted to be named sole decision-maker and believed making decisions jointly would be "a path for more conflict."

Mother acknowledged that the parties had not experienced any issues with Lasa using an alternating weekly schedule during the month that elapsed between the trial dates, although she noted that school was not in session for most of that time due to Christmas break and snow days. She admitted that during her deposition she made a comment about not looking forward to co-parenting; however, she had added, "I don't want this divorce. I don't want my family to break up." Mother testified that she envisioned coparenting with Father as "[c]ommunicating on the necessities" so that it would be smoother for Lasa going back and forth. She conceded that this would require direct communication and testified that she and Father had been able to effectively communicate regarding the children on the things that were required. However, Mother noted a recent example of poor communication when she and Anna took Lasa to her school musical performance and had

- 13 -

no knowledge that Father was even in attendance, and when they went to pick up Lasa, they happened to see Father leaving with her. Mother said it shocked Lasa, Anna, and her because Father did not communicate this plan to any of them.

Mother testified that Father had informed her in December 2022 (shortly before the divorce was filed and just one year before trial), that during their marital struggles in the past two years he had "wished for his death or my own." She thought it was concerning that Father's depression was so severe that he would wish for his own death or hers. She said he had been seeing a counselor for several years. Mother said she had also learned from Father that when they moved into the marital residence in 2021, that a "little water closet was where he felt safe – the only place he felt safe," and apparently he would go into the water closet even though she did not know it at the time. She believed his "disengagement" and depression reflected poorly on his parenting. Mother admitted that she no longer trusted or respected Father, feeling as if she did not "even know who he is any more." She noted Father's letter to his parents explaining his "abnormal reactions to normal situations" and suggested it was outrageous for him to suggest that she had been emotionally abusive to Noah when he admittedly reacts abnormally to normal things.

Mother was 44 years old and had been a stay-at-home mother since Noah was adopted with the exception of working "little side jobs" for a friend's organizing business. She had renewed her teaching certificate the previous summer and began working in August 2023. She testified that she had not applied for any other jobs because she wanted to complete homeschooling Anna and get Lasa through elementary school before working full-time. Thus, Mother testified that she was not opposed to working as a teacher but wanted to wait two years until Anna, currently a Sophomore, finished homeschool, and Lasa, currently in third grade, reached middle school.

Mother testified that her current job paid $30 per hour and that she typically worked five hours per day five days per week, but her hours were less if the month included a break from school. Her monthly net income was typically around $1,800, but in January, she earned less than $1,000, and she would not work during summer breaks. Her income and expense statement reflected monthly net income of $1,542.52 and monthly expenses of $4,793.90, for a monthly deficit of $3,251.38. She would also begin paying for health insurance the following month. She testified that she was seeking an award of spousal support somewhere between $1,000 and $2,000 per month, which, with child support, she said would give her just "enough to be able to get by" if she carefully managed her finances. Mother testified that she believed such an award would be fair given how much money Father earned per year and the fact that she stayed home to raise their children. She believed Father should also be responsible for paying her attorney fees because she was opposed to getting a divorce in the first place.

Finally, the trial court heard testimony from Anna, who was 15 years old. She stated that she was not entirely sure why she was there but "just hope[d] to maybe get more time

- 14 -

with Lasa." She testified that she and Lasa were really close and spent a lot of time together, and she wanted that to continue. When asked what they do together, Anna responded, "Everything." She listed a number of activities. Anna was asked how often she had seen Mother or Father helping Lasa with homework. She testified that she had seen Mother helping Lasa "very often" but never Father prior to the divorce being filed. When asked to describe Father and Lasa's interactions, she said "[t]hey'd play together after dinner."

Anna was then asked about her own relationship with Father prior to the divorce. She said, "I loved my dad." When asked how the relationship had changed, Anna testified that "he's kind of altered my life in a way that is negative and he can't answer for it." Father's counsel asked her the following questions:

> Q. Have you and your dad talked about what all's going on, what this is about, what you would come in and testify about?
> A. No.
> Q. Okay. Have you and your mom talked about what's going on?
> A. Yes.
> Q. Okay. What's your mom told you about what's going on?
> A. She won't tell me any of like the legal stuff, but she tells me that -- I don't know. She doesn't talk to me a lot about it anymore.
> Q. Okay. Did she at one point talk to you about it?
> A. Back this summer there was, yeah.
> Q. Okay.
> A. But then she told me that you or dad said that she can't talk to me anymore. It's really annoying.
> Q. Okay. You and her spend a lot of time together?
> A. Yes.
> Q. Okay. Was that in her room when your dad would come home?
> A. Yes.
> Q. Okay. Did she ever encourage you to talk with your dad or y'all try to patch things up?
> A. She did at first, but then she just let me do my thing.
> Q. Okay. Do you still want to see your dad?
> A. No.

The trial judge then asked Anna why she did not want to see Father. Anna replied, "It's just a very broken relationship and it's not one that I'm ready to mend." She added that Father "[has] not done anything to fix it." She testified that Father "has hurt me in a lot of ways this year." She noted that he filed for divorce when "he knew [it] was going to affect me and my siblings negatively." She also said, "He's gone against everything he's ever taught me about my faith and he can't answer my questions." Anna explained that she had asked him: "How do you think this is okay?" She testified that the Bible taught that unless

divorce is on the basis of sexual immorality, it "is not okay, and yet he's doing it" and "can't tell me why he's doing it." She said she was "sick" of Father telling her that he would talk to her about it when she was older. When asked how much time she currently spends with Father, Anna said "[n]one," and she said when they still resided in the marital residence she "avoided him as much as possible." She explained that the relationship between her and Father began to change at the end of April, about a month after the divorce was filed. She explained, "I tried to maintain a relationship with him, but I felt two very different things after spending time with each of my parents and I know there can only be one truth. And my mom's able to answer when I asked her questions. My dad could not." The trial judge suggested that she consider that people have different perspectives and asked her to explain her view on truth, to which Anna replied, "There's right and wrong. There's no in between, usually. My faith, there is one truth." She explained that she had a strong Christian faith that was instilled by both her parents. When asked why she sent back Father's Christmas gifts unopened, Anna testified, "I don't want anything to do with him. He's being a hypocrite." She noted that Father attempted to give her Christmas presents while setting up a camera in the house to watch them, as Noah "even said there were multiple ones specifically to watch us." Anna said, "That doesn't make sense, giving me Christmas presents and then doing that." The trial judge then took the matter under advisement.

The trial judge announced his oral ruling as to parenting time in February 2024. Despite listing the sixteen best interest factors for consideration, the trial judge stated that "one factor has played an outsized role in the Court's determination." The trial judge found that Mother "has not attempted to foster a healthy relationship with specifically Anna and [Father], and that has sometimes reflected itself in the care of Lasa." The trial judge gave some examples, which we will discuss in detail later in this opinion. As a result of this analysis, the trial judge adopted Father's proposed parenting plan and designated him as Lasa's primary residential parent, with Lasa having an alternating weekly schedule. The trial court reserved its decision on alimony and attorney fees.

The trial court entered a final decree of divorce in May 2024. Pertinent to this appeal, Father was named primary residential parent of Lasa, with the parties alternating weekly parenting time. The parties were given joint decision-making authority. The trial court imputed income to Mother and calculated Father's child support obligation at $1,048 per month. The trial court denied Mother's request for alimony in futuro and instead awarded her transitional alimony of $2,203.38 for a period of five months. Father was ordered to pay this amount from his share of the proceeds of the marital residence. The order stated that the court anticipated that Mother could obtain a full-time teaching job by the coming school year, in August 2024. The trial court found that Father had incurred $17,422 in attorney fees while Mother had incurred $30,001.76. It found that Father had paid $6,000 of his attorney fees from a retirement account, so the court ordered him to pay an equal amount toward Mother's attorney fees out of his share of the marital residence. Each party was responsible for paying the remainder of his or her own fees. Mother timely

filed a notice of appeal.[5]

## II. ISSUES PRESENTED

Mother presents the following issues for review on appeal:

1. Whether the Trial Court erred in its adoption of the Father's proposed parenting plan.
2. Whether the Trial Court erred in its award of spousal support to the Ex-Wife.
3. Whether the Trial Court erred in its allocation of marital debt, specifically as it relates to the Ex-Wife's attorney fees; alternatively, whether said fees should have been awarded as alimony in solido.
4. Whether the Ex-Wife should be awarded attorney fees incurred on appeal.

For the following reasons, we reverse in part, vacate in part, and remand for further proceedings.[6]

## III. DISCUSSION

### A. *Parenting Issues*

Appellate courts review a trial court's factual findings "de novo upon the record, accompanied by a presumption of the correctness of the findings, unless the preponderance of the evidence is otherwise." *Armbrister v. Armbrister*, 414 S.W.3d 685, 692 (Tenn. 2013). We review questions of law de novo with no presumption of correctness. *Id.* With

---

[5] Mother filed a motion to alter or amend, stating that Father had moved to Lebanon after the sale of the marital home and that she feared he would enroll Lasa in a school there using his designation as primary residential parent. She noted Father's trial testimony that he intended to reside in Sumner County where Lasa was attending Benny Bills Elementary. She asked the trial court to amend its order to require that Lasa attend school at Benny Bills. Father filed a response, claiming that he had been unable to find a suitable apartment near Benny Bills and that Lasa's out-of-zone approval had been denied by the school in any event. Husband's response stated that he was obtaining a residence in the Lebanon school district and that he had offered to drive halfway to Mother's residence each day due to the additional distance, but she had declined. Mother filed a reply, attaching documentation from the principal of Benny Bills stating that Lasa could continue to attend school there because of Mother's employment with the county. Mother claimed that the school Father wanted Lasa to attend would be "a 50-minute drive each way" from her home in Hendersonville. After a hearing, the trial court entered an order denying the motion to alter or amend and stating that Mother's request to be named primary residential parent of Lasa and her oral request that the parenting plan be amended to order that Lasa attend Benny Bills Elementary were denied.

[6] We note that Mother raises no issue regarding the denial of her motion to alter or amend. As such, the trial court's decision regarding that motion is not before us on appeal. As it is, the only proof that is in the record and properly before us regarding the parties' circumstances is that presented at trial.

respect to parenting matters, our supreme court has further explained:

> Because decisions regarding parenting arrangements are factually driven and require careful consideration of numerous factors, *Holloway v. Bradley,* 190 Tenn. 565, 230 S.W.2d 1003, 1006 (1950); *Brumit v. Brumit,* 948 S.W.2d 739, 740 (Tenn. Ct. App. 1997), trial judges, who have the opportunity to observe the witnesses and make credibility determinations, are better positioned to evaluate the facts than appellate judges. *Massey-Holt v. Holt,* 255 S.W.3d 603, 607 (Tenn. Ct. App. 2007). Thus, determining the details of parenting plans is "peculiarly within the broad discretion of the trial judge.'" *Suttles v. Suttles,* 748 S.W.2d 427, 429 (Tenn. 1988) (quoting *Edwards v. Edwards,* 501 S.W.2d 283, 291 (Tenn. Ct. App. 1973)). "It is not the function of appellate courts to tweak a [residential parenting schedule] in the hopes of achieving a more reasonable result than the trial court." *Eldridge v. Eldridge,* 42 S.W.3d 82, 88 (Tenn. 2001). A trial court's decision regarding the details of a residential parenting schedule should not be reversed absent an abuse of discretion. *Id.* "An abuse of discretion occurs when the trial court ... appl[ies] an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." *Gonsewski v. Gonsewski,* 350 S.W.3d 99, 105 (Tenn. 2011). A trial court abuses its discretion in establishing a residential parenting schedule "only when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." *Eldridge,* 42 S.W.3d at 88.

*Armbrister*, 414 S.W.3d at 693.

"Decisions involving the custody of a child are among the most important decisions faced by the courts." *Grissom v. Grissom*, 586 S.W.3d 387, 391 (Tenn. Ct. App. 2019) (citing *Steen v. Steen*, 61 S.W.3d 324, 327 (Tenn. Ct. App. 2001)). When fashioning a residential schedule for a child,

> [t]he court shall make residential provisions for each child, consistent with the child's developmental level and the family's social and economic circumstances, which encourage each parent to maintain a loving, stable, and nurturing relationship with the child. . . . If the limitations of § 36-6-406[7] are not dispositive of the child's residential schedule, the court shall consider the factors found in § 36-6-106(a)(1)-(15).

---

[7]    The referenced section, 36-6-406, instructs a court to limit residential time for a parent who "has engaged in certain specified conduct or who exhibits certain traits." *Ford v. Ford*, No. M2023-01762-COA-R3-CV, 2026 WL 125827, at *4 n.9 (Tenn. Ct. App. Jan. 16, 2026).

Tenn. Code Ann. § 36-6-404(b). "The paramount concern in establishing a permanent parenting plan is the best interest of the child[.]" *Maupin v. Maupin*, 420 S.W.3d 761, 770 (Tenn. Ct. App. 2013). Taking into account the child's best interest, the trial court "shall order a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child consistent with the factors set out in [] subsection (a), the location of the residences of the parents, the child's need for stability and all other relevant factors." Tenn. Code Ann. § 36-6-106(a).

Mother argues on appeal that the trial court erred in its analysis of the statutory best interest factors, so we will address each one in turn. At the outset, however, we note the limited findings that are present in the final decree of divorce regarding parenting issues. The order simply states:

> The parties have three (3) children born of this marriage: Noah Brown [], Anna Brown [], and Lasa Brown []. Based on the testimony of the parties and of the minor child, Anna Brown, and all factors contained in Tenn. Code Ann. § 36-6-106, this Court finds that it is in the minor children's best interest that this Court adopt Husband's proposed Permanent Parenting Plan regarding Lasa. The parties have jointly stipulated that Mother will have 233 days of parenting time per year with Anna Brown with Father having 132 days. The parties have further jointly stipulated that Father will have 233 days of parenting time per year with Noah Brown with Mother having 132 days. Noah and Anna Brown shall have discretion to move between the parties' homes as they choose. This Court further finds that Wife has been the primary caregiver for the parties' children prior to this proceeding; however, Father has taken advantage of the time he has had with Lasa and Father has supported her both financially and in other ways. This Court further finds that Wife has failed to facilitate a relationship between the children and Husband and testified to this Court that she does not believe it is her responsibility to do so. This Court further finds that Wife has attempted to make the parties' daughter, Anna Brown, a confederate in this matter and has sought emotional support from Anna. This Court further finds that Wife has caused psychological damage to the parties' children. This Court seriously considered limiting Wife's parenting time with Lasa due to the provisions of Tenn. Code Ann. §36-6-406(d)(5) which provides, "A parent's residential time as provided in the permanent parenting plan shall be limited if the limitation is found to be in the best interest of the minor child and if the Court determines based upon reliable evidence that a parent has engaged in the abusive use of conflict by the parent that creates the danger of damage to the child's psychological development." Had Husband requested a traditional every other weekend schedule for Wife, this Court would have given that serious consideration. Therefore, Husband shall be deemed

- 19 -

primary residential parent of the youngest child, Lasa Brown, and the parties shall share decision making authority.

There is no attached transcript of the trial judge's oral ruling, nor was it incorporated by reference into the final decree. However, the record before us does contain a transcript of the proceedings from the day the trial judge announced his decision on parenting issues, entitled, "Judge's Ruling." The trial court also entered a "Memorandum Opinion" on a proposed final decree of divorce, which mentioned "the Court's oral ruling from the bench." In the interest of judicial economy, we will consider the trial court's oral ruling regarding the best interest factors to enable appellate review of the trial court's decision. However, as we will explain below, even this action does not cure all of the deficiencies with the trial court's ruling.

During his oral ruling, the trial judge summarily stated that he "found that Factors 3, 8, 11, 12, 13, 14, 15, and 16 were either not applicable or did not militate substantially in favor of either party." However, the trial court never specifically stated whether the remaining eight unlisted factors weighed in favor of Father, Mother, or both equally. Rather, the court simply stated that "one factor has played an outsized role in the Court's determination." The trial court made some general factual findings but did not separate those findings as applying to particular factors. Thus, we will review the trial court's general factual findings and attempt to attribute them to the various factors.

The first factor for consideration is "[t]he strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child." Tenn. Code Ann. § 36-6-106(a)(1). The final decree of divorce states that "[Mother] has been the primary caregiver for the parties' children prior to this proceeding; however, Father has taken advantage of the time he has had with Lasa and Father has supported her both financially and in other ways." In the trial judge's oral ruling, he found that Lasa had a strong, healthy, and stable relationship with both parents. He found that the parties agreed that "[Mother] would perform the majority of caregiving tasks for Lasa, and [Father] would serve as the breadwinner for the family." The trial judge found that Mother helped Lasa with her schoolwork, did most of the cooking and laundry, and "served the role that the parties agreed upon well and faithfully." The trial judge found that Father acknowledged that Mother was a good mother and was equally capable of providing for Lasa's needs. The judge noted that Father "took full advantage of the time that he had with Lasa, however limited it might have been by his work schedule." He noted Father's testimony that "Lasa's love language was quality time, and that he had tried to make that priority, whether it was cooking with her, playing with her, or reading bedtime stories together." Ultimately, the trial court did not state whether this factor weighed in favor of either party. We conclude that it weighs in Mother's favor given that she clearly performed the overwhelming majority of parenting responsibilities relating to the daily needs of the child, and Father's time with Lasa was limited. *See Rajendran v. Rajendran*, No. M2019-00265-COA-R3-

CV, 2020 WL 5551715, at *5-6 (Tenn. Ct. App. Sept. 16, 2020).

We now turn to factor 2, which the trial court gave "significant weight." It requires us to consider:

> Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order.

Tenn. Code Ann. § 36-6-106(a)(2). Specifically, we consider Mother's willingness and ability "to facilitate and encourage a close and continuing parent-child relationship" between *Lasa* and Father, consistent with *her* best interest. *See id.* We consider the likelihood that Mother would honor and facilitate court ordered parenting arrangements and rights and any history of denying parenting time in violation of a court order. *See id.* "[T]his factor may, depending upon the circumstances of the case, be an important part of the court's best interests determination and 'may very well dictate the outcome of the analysis.'" *Solima v. Solima*, No. M2014-01452-COA-R3-CV, 2015 WL 4594134, at *5 (Tenn. Ct. App. July 30, 2015) (quoting *In re Marr*, 194 S.W.3d 490, 499 (Tenn. Ct. App. 2005)). "Our case law is accordingly replete with examples where the greater willingness of one parent to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent has been the decisive factor in determining parenting arrangements." *In re Zamorah B.*, No. M2011-00864-COA-R3-JV, 2013 WL 614449, at *6 (Tenn. Ct. App. Feb. 15, 2013) (citing *In re Jonathan S. C-B*, M2010-02536-COA-R3-JV, 2012 WL 3112897 (Tenn. Ct. App. July 31, 2012); *Howe v. Howe*, E2008-02580-COA-R3-CV, 2010 WL 323068 (Tenn. Ct. App. Jan. 28, 2010); *Morman v. Morman*, M2005-00931-COA-R3-CV, 2006 WL 2068757 (Tenn. Ct. App. July 25, 2006)).[8]

---

[8] We briefly note the facts, however, in these examples. In *Jonathan S. C-B*, 2012 WL 3112897, at *14, this factor was deemed "especially relevant" where the trial court found that the mother engaged in "a deliberate process of alienation by accusing Father of abusing the minor child, that she had refused to consider any evidence that the alleged abuse had not occurred, and that her obsession had led her to subject the child to multiple physical and verbal interviews and examinations of the child, which were not merited, did not produce any valid disclosures, and were detrimental to the child's well-being." In *Howe*, 2010 WL 323068, at *2, the trial court stated "the father won 'hands down' on [this] factor" and noted that the mother had tried to get the father arrested on more than one occasion, deprived him of visitation for no good reason, and said inappropriate things to the father in the child's presence. The mother had "screaming episodes in

We now examine the findings the trial court made in support of its decision to give this factor significant weight. In the final decree, the trial court found that "[Mother] has failed to facilitate a relationship between the children and [Father] and testified to this Court that she does not believe it is her responsibility to do so." We cannot agree with this finding regarding Mother's testimony to the extent that it relates to Lasa. Mother testified that she did not believe it was her responsibility to encourage a relationship between Father and *Anna*. However, Mother testified that she does encourage the relationship between Father and *Lasa*. She testified:

> Q. Okay. What about Lasa? Do you encourage a relationship between Lasa and [Father]?
> A. Sure.
> Q. Give me an example of how you encourage that relationship.
> A. I don't stand in the way of her going back and forth. When she comes back from doing things with [Father], I'm excited to hear the details of the things they did. Yeah. There's been no discouragement.

When asked again what she would do to foster a good relationship between Lasa and Father, Mother said she would abide by all court-mandated directives, provide him notice of things, "meeting up," and "not talking about [Father]." She noted that after Lasa spends time with Father, "when she comes home and tells me what she's done, I meet her and I celebrate with her." As an example, she stated, "I wasn't a fan of [Father] taking her to get her braids done, but they were lovely and she loves them, so I love them with her." As

---

the child's presence." *Id.* at *1. Finally, in *Morman*, 2006 WL 2068757, at *5, the trial court relied on "Father's ability to better facilitate a positive parent-child relationship between Mother and the children," concluding that "Mother had taken affirmative steps to interfere with Father's relationship with the children." The mother made his contact with the children as difficult as possible, failed to timely respond to his requests for information about them, unilaterally demanded changes in the transportation arrangement after she moved, indicated that "knowing the children's whereabouts [was] none of [Father's] business," failed to inform him of daycare arrangements, and lied to him about the fact that the children were seeing a counselor. *Id.* at *4.

Similarly, in *In Zamorah B.*, 2013 WL 614449, at *6-7, we affirmed a trial court's decision to deem factor 2 the "decisive factor" where the mother "repeatedly refused to abide by the Court's order regarding derogatory remarks about the father in the presence of the minor child, visitation, and medical issues," "continuously allowed her feelings about the father to control her behavior despite numerous Court Orders," and had been held in contempt for withholding visitation. In *Rucker v. Harris*, No. M2013-01240-COA-R3-JV, 2014 WL 3530851, at *4 (Tenn. Ct. App. July 15, 2014), this Court acknowledged that factor 2 "has been decisive in a number of cases," but we distinguished *Zamorah B.* and *Johnathan S. C-B* as cases in which "one of the parents showed such unrelenting and irrational hostility towards the other that it would have eliminated any possibility for the child to have a healthy relationship with both parents if left in the care of the hostile one." That was not the situation in *Rucker*, as the parties "generally put the best interest of the children first, despite the disagreements that have sometimes arisen between them." *Id.* at *4. *See also Solima*, 2015 WL 4594134, at *6 (distinguishing this line of cases because the case before it was not one in which "one party has engaged in egregious behavior while the other has steadfastly maintained his or her willingness to co-parent").

such, the trial court's finding that Mother "testified to this Court that she does not believe it is her responsibility" to facilitate a relationship between Father and Lasa is not supported by the evidence.

Next, during his oral ruling, the trial judge stated that "[t]he difficult part of this case, and a theme that has emerged consistently in this case is that [Mother] has not attempted to foster a healthy relationship with specifically Anna and [Father], and that has sometimes reflected itself in the care of Lasa." However, he only listed one example that concerned Lasa. The trial judge stated:

> One example that the Court found telling was [Father] testified that though he expressed a desire to take Lasa to school more than once a week, [Mother] was not open to that idea and she felt that that was her job.
> In her pretrial deposition, [Mother] testified that even though [Father] would be taking Lasa to school post-divorce more often, she did not think it was appropriate for [Father] to take Lasa to school more often to prevent adjustment to a new routine that was certain to happen.

Having carefully reviewed the record, we do not discern anything unreasonable about Mother's actions with respect to this issue. She testified that she had been taking Lasa to school in the mornings "all of these years," with the exception of Father taking her one day a week "off and on, when he could . . . for a little while." It was not until after the divorce was filed that he proposed to start taking Lasa two days a week rather than one. The parties' text message exchange is in the record before us, and Mother simply responded, "No thanks. That's my job and I'd like to maintain our normal routine." Mother explained that she had always taken Lasa to school and that it was "a stretch" to say Father had been taking her one day a week. Still, the parties ultimately agreed that Father would take Lasa to school on Thursdays. Mother testified that she wondered how Father would manage taking Lasa to school on additional days "because there are days when he leaves very early and he would not be able to drop her off." On the days when Father took Lasa to school, he dropped her off at 7:00 a.m. so that he could arrive in Lebanon by 8:00 a.m. Mother also admitted that she felt this was an attempt by Father to remove some of her responsibilities in order to "set up his token participation" for the court, as it was something he had never done before. Mother conceded that, in the midst of the divorce proceeding, she was wary of Father pushing her out of her regular responsibilities so that he could come to court and say, "I do this, I do this." As for the deposition testimony the trial judge referenced, Mother was asked during her deposition:

> Q.   Now, you agree that when this divorce is final, that he will be required to take Lasa to school.
> A.   Absolutely. That will be out of my hands.
> Q.   Do you think it would be a good idea to allow him to do some of that now, while y'all are still living together, and she's able to adjust to

that and -

A.     No, I don't.

The judge stated that this "prevent[ed] adjustment to a new routine that was certain to happen." However, a new routine was not certain to happen at the time of Mother's deposition. She proposed a parenting schedule whereby Lasa would live primarily with her and have parenting time with Father one weeknight per week and every other weekend. Thus, Mother testified that she was trying to "maintain[] the routines" the family had. In our view, this does not reflect negatively on Mother's parenting or require weighing this factor against her. Maintaining a routine the parties had for years would provide stability for Lasa during the divorce.

We now turn to the trial court's findings with respect to this factor regarding the older children. Based on Mother's "history with her older two children," the trial judge predicted in his oral ruling that "Lasa will be forced into a damaging game of you're either with me or against me." The judge stated that he was "struck by the contrast" in the older children's relationships with Mother and Father. He stated that "[t]he situation with Noah and Christmas" was "a good example." The judge said that Noah was supposed to spend time with Mother during Christmas but changed his mind and wanted to spend time with both parents during the holiday. The trial judge found that the text messages showed that Father "was attempting to handle Noah's change of plans in a thoughtful, considerate way," while Mother, rather than recognizing the way the divorce could be affecting Noah, "told him she didn't want him to come to Alabama for any time during the Christmas holiday." This, however, is only half of the story. Noah proposed to leave Alabama on Christmas day and drive back himself, and Mother stated in her text message to Father that Noah was "insensitive to the situation and dismissive and rude." When Father said he had advised Noah to think about it "overnight and into tomorrow before deciding," Mother responded with a message stating, "Unfortunately, it's not his decision to make anymore. He's made them all uncomfortable and hurt and they don't want that energy there." She later sent another message stating, "Neither do I." She added that "the decision to be unkind was his." Mother wrote that "the selfishness, disrespect, and disregard for his mother and family continues." Her text message to Noah explained that he had been "wrong headed and cold toward a lot of people who have loved you and done good to you at every turn," as he hurt not only her and Anna but his grandparents and cousins, and she expected him to send a sincere apology to them in his stead. She explained to Father that Noah "called me pissy, childish, and whiny," "refused to meet up," and "wrapped it up in sarcasm and mockery." Thus, it appears that it was Mother's family who made the decision to disinvite Noah, and it was because of his rudeness to them. While the situation was unfortunate, it was not a simple case of Mother wanting to punish Noah for asking to spend time with Father at Christmas, as she appeared primarily concerned with his behavior and attitude.

The next issue the trial judge mentioned in his oral ruling relates to language used by Mother during her deposition. He stated:

- 24 -

The Court is also tremendously concerned with respect to how [Mother] discusses Noah. She doesn't refer to Noah as a child who isn't always honest and sometimes doesn't play fair. She labels him as a cheater and a liar. Labeling a child is damaging. A parent is supposed to teach, guide, and correct inappropriate action, not label. Labeling tells a child that one of the two most important people in their life has defined them and given up on them.

We agree that it would have been preferable for Mother to state, when explaining why Noah needed more supervision with his homeschool, that he cheats and lies rather than using the terms she did. When asked about Mother's statements, Father agreed that Noah "[has] had some times where that's been a struggle for him." Ultimately, though, "we do not wield custody and parenting time decisions as weapons to punish parents for their poor decision-making." *In re Gabby G.*, No. M2024-00541-COA-R3-JV, 2025 WL 2335851, at *10 (Tenn. Ct. App. Aug. 13, 2025). Misconduct of parents may properly be considered in the determination of custody when determining what is in the best interest of the child. *Id.* However, "[c]ustody should never be used to punish or reward the parents, but rather should promote children's best interests by placing them in an environment that will best serve their physical and emotional needs." *Gaskill v. Gaskill*, 936 S.W.2d 626, 630 (Tenn. Ct. App. 1996) (citations omitted). Mother's use of these two terms in her deposition with respect to her nearly eighteen-year-old son does not weigh heavily in our analysis of what parenting schedule is in the best interest of Lasa.

Next, the trial judge credited Father for his position with respect to Anna. He found that Father "has clearly not given up on his daughter," but "[r]ecognizing that Anna has taken a side, [Father] has not tried to force a relationship on – upon her but has continued to stay in contact with Anna and to be available when and if she is ready." This is at odds with Mother's testimony that Anna feels harassed by Father. Mother testified that Father continued to go into her space when they were still living in the same house and left notes for her, "[e]ven after her counselor has told him to stay out of her space." She testified that Father went through her trash and questioned things she had thrown away. She said he also "manipulated situations to try to make her be with him against her will," which resulted in Anna being "in tears and her fleeing." Thus, the trial court's finding that Father "has not tried to force a relationship" with Anna is not supported by the record.

Next, the trial judge stated during his oral ruling that he found "the impact that [Mother's] behavior has had on her daughter Anna" to be disturbing. He found that Mother had treated Anna "not as her child, but as an ally." The judge listed several examples:

Whether stating that it's not her responsibility to facilitate and encourage a close and continuing parent/child relationship between Anna and her father, promoting physical separation by spending large amounts of time alone in

her bedroom with Anna, sequestering her from her siblings and her father, discussing the wrongness of [Father's] desire for a divorce with Anna, or in a telling response to a deposition question, when asked whether the home environment was healthy for Anna, [Mother's] response was, "No. We are ready for it to be over."

The trial judge stated that a parent is supposed to provide emotional support to a child, and yet Mother was seeking emotional support from her daughter.

Interestingly enough, Mother testified that *Father's* counselor told him that *he* was having his emotional needs met in the children. As for the living situation while the parties continued to reside in the marital residence together during the divorce, everyone appeared to agree that it was an unhealthy environment and that they were ready for it to be over. Father testified during his deposition, "It's a hard environment at home, yes." He said he and Mother generally only communicated by text message. Father even filed a motion to sell the marital residence prior to trial, which stated that Anna's therapist had informed him "that the child is emotionally struggling and will not be able to begin to accept the parties' separation, heal, or repair her relationship with Husband as long as the parties continue to reside together." Mother testified that she stayed in her bedroom once Father got home from work because she did not want to "hang out" with Father and wanted each of them to have their own space. However, she said, "I do not separate Anna from him." She said she also informed Noah and Lasa that they could come and go from her room as they pleased. We view this as a reasonable response to a difficult situation. The trial court essentially faulted Mother for staying in her bedroom while saying nothing of Father hiding in a water closet.

We presume that the trial court's reference to Mother discussing the "wrongness" of the divorce was due to her discussion of whether the divorce was unbiblical. Again, it appears that this issue was handled in an entirely appropriate manner given that the entire family sat down together to discuss the matter, and Father did not object to what was said. Mother testified that she characterized the divorce as unbiblical "[i]n scriptural opinion" but noted that "this is the opinion that [Father] has raised our family on too." According to Mother, Father was removed from the membership of their church "as a result of this unbiblical divorce."

Finally, the trial court found that Mother "has caused psychological damage to the parties' children." The judge found that Mother's "parentification of Anna will psychologically damage her in ways that will manifest themselves later in her adult life," and he found that "[t]hrough Anna's own testimony, it is clear to the Court that [Mother] has co-opted her daughter as a confederate in this divorce and that damage has been done." Again, we find no support for the trial court's conclusion that psychological damage has been done. There was certainly no expert testimony to that effect at trial, and we find nothing to suggest that *Mother* has caused psychological damage to any of the children.

- 26 -

Although Anna was seeing a counselor, the proof at trial was that the counselor told *Father* "to stay out of her space" and yet he continued to go into her space anyway and leave notes and go through her trash.[9]

In summary, it is undisputed that Mother has taken the position that it is not her responsibility to encourage the relationship between Anna and Father. At the same time, she testified that she was not going to *discourage* Anna from having a relationship with Father and told Anna, "it's going to be okay if you feel differently later." Mother testified that she had not spoken *negatively* about Father in front of the children, nor had she allowed anyone else to do so. This testimony was not disputed by anything except possibly Father's unsupported speculation. In essence, Mother had taken a neutral position regarding this particular relationship. Factor 2 requires us to consider each parent's "past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents [] to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child." Tenn. Code Ann. § 36-6-106(a)(2). Thus, Mother's refusal to encourage the relationship between Anna and Father is a factor to be considered, and it weighs against her in the best interest analysis. But, we must keep in mind that we are considering the best interest of Lasa. Returning to the language of the statute, we do not foresee any likelihood that Mother would fail to facilitate court ordered parenting arrangements, and she has not denied parenting time to Father in violation of a court order. *See id.* We also note that despite Father's suspicions about Mother alienating the children, he does not point to a single derogatory remark by Mother about him. Having carefully reviewed each of the examples cited by the trial judge, we find no egregious behavior by Mother. Thus, we deem this factor to favor Father, but we do not give it significant weight.[10]

---

[9] For the same reasons, we find no basis for the trial court to have threatened the use of Tennessee Code Annotated section 36-6-406(d)(5), which provides that a parent's residential time shall be limited if the Court determines that a parent has engaged in "[t]he abusive use of conflict by the parent that creates the danger of damage to the child's psychological development."

[10] We considered a comparable situation in *Brown v. Brown*, 571 S.W.3d 711, 718-19 (Tenn. Ct. App. 2018), where a trial court deemed factor 2 "dispositive" and named a father primary residential parent, largely relying on text messages between the parties during the early months of the divorce in which the mother displayed "quite the temper" and used derogatory terms and an expletive "to describe what type of father she believed him to be." She had been critical and dismissive of the father during early hearings but by the time of the final hearing "had softened her attitude and articulated an understanding of the need of the child to have a good relationship with both parents." *Id.* The father offered the messages to prove "the name-calling itself" but did not contend that the mother threatened interference with his parenting rights. *Id.* at 720. We concluded that the messages had "little to no probative value in the factor (2) analysis." *Id.* We explained, "It is common for divorcing parents to harbor animosity toward one another, especially in the early stages of the divorce. It is also common for divorcing parents to be uncivil in their communications with one another." *Id.* However, we noted that the parties had largely sheltered the child from the brunt of their verbal attacks by containing their incivility to private messages. *Id.* Putting aside the messages, we were "left only with the trial court's speculation" about the reason for the mother's recent improved behavior and "the possibility of future bad conduct." *Id.* We noted, "Although a trial court has extensive

We now move on to factor 3, regarding refusal to attend a parent education seminar. Tenn. Code Ann. § 36-6-106(a)(3). We agree with the trial court that it is inapplicable. Factor 4 is "[t]he disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care." Tenn. Code Ann. § 36-6-106(a)(4). In the trial court's oral ruling, it found that the parties' traditional homemaker-breadwinner arrangement during the marriage "provided stability for Lasa and reflected the positive disposition of each party to create and provide her with a home structure that provided for her food, clothing, education, medical, and other necessary care." It found that "[b]oth parties have the capability, the willingness, and most importantly, the desire to meet her needs." The court did not state whether this factor weighed in favor of either party. We conclude that this factor weighs equally in favor of both parties.

Factor 5 requires us to consider "[t]he degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities." Tenn. Code Ann. § 36-6-106(a)(5). The court did not state whether this factor weighed in favor of either party. Father admitted at trial that Mother had been the children's primary caregiver and conceded that this factor favors Mother. For the same reasons discussed with respect to factor 1, we likewise conclude that this factor weighs in favor of Mother.

Factor 6 is "[t]he love, affection, and emotional ties existing between each parent and the child." Tenn. Code Ann. § 36-6-106(a)(6). The trial judge found "ample evidence in the record reflecting that both mother and father were bonded with Lasa in a way that reflected love and affection." He did not state whether this factor weighed in favor of either party. We conclude that this factor weighs equally between the parents.

---

discretion in determining which parent is more likely to facilitate and encourage a good relationship between the child and both parents, the court's decision must be guided by the language of the statute." *Id.* The statute "specifically instructs courts to 'consider the likelihood of each parent ... to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider *any history of either parent ... denying parenting time to either parent in violation of a court order*." *Id.* (quoting Tenn. Code Ann. § 36-6-106(a)(2) (emphasis added)). We also pointed to caselaw regarding this factor that had "emphasized the importance of considering a parent's compliance with court-ordered parenting arrangements" while rejecting a trial court's "mere speculation" without any evidentiary basis for its "implicit prediction." *Id.* at 721 (citing *Burden v. Burden*, 250 S.W.3d 899, 910 (Tenn. Ct. App. 2007)). In conclusion, we held that the trial court "erred by overemphasizing the petty insults that mother directed at father in private communications during the early stages of the divorce" when "[t]he content of those messages [was] not probative of mother's willingness to facilitate and encourage a good relationship between the child and father." *Id.* There was nothing to suggest that the mother had a history of violating court orders or interfering with the father's rights, so we found that the trial court "erred by presuming that mother would seek to undermine the child's relationship with father absent any evidence that mother had previously interfered with their relationship or threatened to do so in the future." *Id.* Thus, we deemed factor 2 neutral and ultimately reversed the designation of the father as primary residential parent. *Id.* at 722, 727.

The seventh factor for consideration is "[t]he emotional needs and developmental level of the child." Tenn. Code Ann. § 36-6-106(a)(7). The trial court did not state whether this factor weighed in favor of either party, but the court found "no evidence that Lasa had any specific emotional need or developmental abilities/disabilities that favor either party." We agree and deem this factor equal.

The eighth factor is "[t]he moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child." Tenn. Code Ann. § 36-6-106(a)(8). This is one of the factors that the trial judge summarily stated was either inapplicable or "did not militate substantially in favor of either party." We disagree with this conclusion as it relates to mental and emotional fitness. Father takes an antidepressant for seasonal depression. He admits that he has an abnormal "trauma response" to normal situations caused by events in his past. As Father put it, "What happens in me is sickness in my stomach, my pulse increasing, muscles tighten up, my mouth gets dry, and above all a desire to get away. So much so that this fight or flight reaction lasts for days afterwards. Three days to be specific." Mother learned that Father had hidden in a water closet in the marital home because it was the only place he felt safe. He admitted to Mother and others at his church that in recent years he had wished for Mother's death or his own. Even though Father testified that his depression has not impacted his ability to parent, Mother testified that she had "concerns for his influence emotionally." She found it concerning that "his depression would be so severe that he would wish for his death or mine." We agree that these issues are concerning and deem this factor as weighing in Mother's favor.

Factor 9 requires consideration of "[t]he child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities." Tenn. Code Ann. § 36-6-106(a)(9). "[A] parenting schedule that separates siblings is discouraged; however, the best interests of the child should be the foremost consideration." *Strickland v. Strickland*, No. M2012-00603-COA-R3-CV, 2012 WL 6697296, at *14 (Tenn. Ct. App. Dec. 21, 2012). The trial court did not state whether this factor weighed in favor of either party, but it did mention factor 9 in its oral ruling when stating that "given the significant amount of time that Anna will be with her mother as agreed upon by the Browns, it is not only likely, but probable that Lasa would be exposed to an echo chamber of criticism towards her father." As previously noted, however, Mother testified that she had not spoken negatively about Father in front of the children, and she said she had not allowed anyone else, including family members, to speak negatively about him either. We deem this factor as weighing equally between the parties given that each parent will have one of Lasa's siblings residing in his or her home.

The tenth factor is "[t]he importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment." Tenn. Code Ann. § 36-6-106(a)(10). The trial judge did not state whether this factor weighed in favor of either party. He noted that Lasa came to live with the family at three days old and was adopted

shortly before her third birthday. We conclude that Lasa has lived in a stable, satisfactory environment. Unfortunately, Lasa's home environment must necessarily change because both parents are moving from their current residence and city. Mother asked the trial court to adopt her proposed parenting plan and permit Lasa to live primarily with her and Anna in order to provide her with a "home base" and stable environment, given that Mother had always served as Lasa's primary caregiver and Anna had shared a room with her for several years. Father's proposal is for Lasa to alternate weeks between each parent's house. Mother's proposed plan would permit her to continue taking Lasa to and from school, while Father's plan requires her to begin an after-school care program. Considering the importance of continuity and stability for Lasa, we conclude that this factor weighs in favor of Mother and her proposed schedule.

We agree with the trial court that factors 11, 12, 13, 15, and 16 were either inapplicable or equal. However, Factor 14 requires consideration of "[e]ach parent's employment schedule." Tenn. Code Ann. § 36-6-106(a)(14). The trial court listed this among the factors it summarily deemed inapplicable or equal and inexplicably made no findings regarding the parties' employment schedules as they related to parenting issues. This is troubling. *See, e.g.*, *Grissom*, 586 S.W.3d at 398 (observing that the trial court's mere statement that factor 14 was "inapplicable" was troubling and perplexing when there was an abundance of proof about the issue at trial and this factor "should have been quite important in the best interest analysis"). We conclude that this factor strongly favors Mother. As we have said before,

> [W]hile virtually all divorced parents must work outside the home, and some parents must work atypical hours, it is not punishment to the parent to consider the effect of her work schedule on the child. Rather, it is the court's job to ensure that the everyday quality of the child's life is not sacrificed to meet the parents' needs or desires. Consideration of how "child-friendly" each parent's schedule must necessarily be part of that determination. "[T]he child's best interest i[s] the paramount consideration. It is the polestar, the *alpha and omega*." *Bah v. Bah*, 668 S.W.2d 663, 665 (Tenn. Ct. App. 1983) (emphasis in original). In this case, it is not unfair to [the parent] to consider the effect of her work schedule on [the child]; rather, it is unfair to [the child] not to consider it.

*Wall v. Wall*, No. W2010-01069-COA-R3-CV, 2011 WL 2732269, at *28 (Tenn. Ct. App. July 14, 2011); *see also Kathryne B.F. v. Michael B.*, No. W2013-01757-COA-R3-CV, 2014 WL 992110, at *10 (Tenn. Ct. App. Mar. 13, 2014) (Kirby, J., concurring) ("Emphasis on the 'fairness' to one parent or another is misguided; the trial court's focus should instead be on the child's best interest. In this case, if Father's work schedule means that the child must spend the majority of his waking hours in the care of someone other than his parent, that must be considered."). Framing the issue in a manner consistent with the traditional comparative fitness analysis, we ask: "Which parent's work schedule is

*better suited* to serve the best interest of the child?" *Brown*, 571 S.W.3d at 724. In *Brown*, for example, we found that a mother's work schedule "would provide the most stability for the child and would minimize the number of hours the child is in the care of third parties," as the father sometimes worked overtime and extended hours. *Id.* at 725. Likewise, in *In re Jayden C.*, No. M2014-00957-COA-R3-JV, 2015 WL 1384346, at *2, *5 (Tenn. Ct. App. Mar. 23, 2015), we explained that a father who was home each evening was in a better position "to provide [the child] with a stable, satisfactory environment," where the mother had long hours and relied on her parents to care for the child. *See also In re McKayla H.*, No. W2020-01528-COA-R3-JV, 2023 WL 2809507, at *14 (Tenn. Ct. App. Apr. 6, 2023) ("Regarding factor (14), because Father is unemployed, he has more flexibility to care for the Child. Thus, factor (14) weighs in favor of Father.").

Here, Father testified that he was looking at rental properties in Gallatin in the school zone for Benny Bills Elementary. However, he had to be at work in Lebanon by 8:00 a.m., so he planned to drop off Lasa at school at 7:00 a.m., the earliest that students could be dropped off. School began at 7:40. It is unclear how much additional time would be spent on their commute to the school in the mornings because it was unknown where Father would live. He had already enrolled Lasa in the after-school care program and planned for her to stay there from 2:40 to 4:30 in the afternoons until he could return after work. So, Lasa would be at school from 7:00 a.m. to 4:30 p.m. each day. She would then have some unspecified commute time home before her bedtime at 7:30. Given Father's history of working much later than 4:00 in the afternoons throughout the marriage, Mother feared that Lasa would, in reality, be staying much longer at school. She testified that Father had already picked her up late once from after-school care and returned to his office with Lasa for a night meeting. Mother, on the other hand, lived 25 minutes away from the school and was available to drive Lasa to and from school without the need for after-care. In addition, Father would be working an hour longer most days during the summers, while Mother would not be working. Mother's work schedule is clearly better suited to serve Lasa's best interest, and this factor strongly favors her.

In summary, we conclude that one factor favors Father, five favor Mother, and the remainder are either equal or inapplicable. The trial court did not state how many factors weighed for or against either parent and apparently gave determinative weight to factor 2, stating that "one factor has played an outsized role in the Court's determination." We recognize that the relevancy and weight of the factors depend on the specific facts of the case, and any one factor may prove determinative. *Waddell v. Waddell*, No. W2020-00220-COA-R3-CV, 2023 WL 2485667, at *37 (Tenn. Ct. App. Mar. 14, 2023). "Determining best interest is not a mathematical formula wherein one can find that certain factors favor one parent over another and then somehow add up the factors to determine the end result." *Broadnax v. Lawrence*, No. E2016-01176-COA-R3-CV, 2017 WL 2482986, at *26 (Tenn. Ct. App. June 8, 2017). Here, however, we have reviewed the factual findings the trial court made in support of its decision to give determinative weight to one particular factor and found that some of those findings were not supported by the

evidence while others reflected entirely reasonable actions by Mother. Notably, in its discussion of factor 2, the trial court gave only one example of conduct by Mother involving *Lasa*, regarding the issue with taking her to school in the mornings, which the court described as an "example that the Court found telling." From our review of the record, however, nothing about that situation warrants any limitation of Mother's parenting time with Lasa or deserves significant weight in our analysis. "[T]rial courts have broad discretion in determining which parent should be the primary residential parent and appellate courts are reluctant to second guess a trial court's decision on this issue when so much depends on the trial court's assessment of the witnesses' credibility." *In re Taylor G.*, No. W2024-01507-COA-R3-JV, 2026 WL 36225, at *3 (Tenn. Ct. App. Jan. 6, 2026) (quoting *In re Shayla H.*, No. M2013-00567-COA-R3-JV, 2014 WL 2601564 at *5 (Tenn. Ct. App. June 9, 2014)). "Nevertheless, trial courts 'still must base their decisions on the proof and upon the appropriate application of the applicable principles of law.'" *Brown*, 571 S.W.3d at 716 (quoting *Gaskill*, 936 S.W.2d at 631).

> [Although] we are reluctant to second-guess a trial court's decisions regarding the adoption of a parenting plan, we will not hesitate to do so if we conclude that the trial court's decision is not supported by the evidence, that the trial court's decision rests on an error of law, or that the child's interests will be best served by another parenting arrangement.

*Id.* (quoting *Massey-Holt*, 255 S.W.3d at 611).[11]

---

[11] This Court's decision in *K.B.J. v. T.J.*, 359 S.W.3d 608 (Tenn. Ct. App. 2011) is also instructive. In that case, the trial court designated the husband primary residential parent and ordered equal parenting time on an alternating week basis. *Id.* at 610. The trial court treated only one statutory factor as "particularly weighty" in its analysis -- the issue of stability and the fact that the wife had expressed a desire to move. *Id.* at 615. We agreed with the wife that the trial court made its decision "not based on a reasoned exercise of discretion, but out of a misdirected focus on whether she could move to Clarksville and whether the parties had agreed on parental decision making." *Id.* The trial court's decision appeared to be based to a degree on frustration that the wife refused to agree to the 50/50 schedule. *Id.* at 617. We explained that "'[w]hile the details of child custody and visitation arrangements are generally left to the discretion of the trial court ... this discretion is not unbounded,' and "[i]t is our job in reviewing for an abuse of discretion to see that the trial court's order is made with due regard for controlling law and based on the facts proven in the case." *Id.* at 615-16 (internal quotation omitted). We concluded that the trial court's reasoning "over-emphasize[d]" the importance of the marital home and "under-emphasize[d] other important facts proved in the case." *Id.* at 616. Other factors to which the trial court gave little or no consideration weighed heavily in the wife's favor. *Id.* We concluded that the trial court "erred in not assigning significant weight to Wife's role as primary caregiver." *Id.* In addition, the husband worked in another city and left before 7:00 a.m., and he did not return home until 5:00 p.m. or later. *Id.* at 611. His employment schedule prevented him from taking the children to and from school, while the wife had an employment schedule "subservient to the needs of the children." *Id.* at 616. We concluded that "[t]he trial court's award of primary residential parent status to Husband, with an equal and inflexible parenting schedule, has the undesirable effect of making the grandfather a de facto parent for several hours every other week when Wife is available to care for them and is asking to be allowed to fill that role." *Id.* We reversed the designation of the husband as primary residential parent and adopted a new parenting schedule. *Id.* at 617.

Here, we conclude that "[a] proper balancing of all factors leads to the conclusion that mother should have been designated as the primary residential parent." *Brown*, 571 S.W.3d at 727. The trial court failed to make any findings regarding Father's employment schedule and commute and the burden that it would impose on Lasa. "[I]f Father's work schedule means that the child must spend the majority of [her] waking hours in the care of someone other than [her] parent, that must be considered." *See Kathryne B.F.*, 2014 WL 992110, at *10 (Kirby, J., concurring). The trial judge erroneously assumed the existence of psychological damage to the children while failing to even mention Father's emotional issues or the fact that he had wished for Mother's death or his own. Given Mother's long history as primary caregiver since Lasa's adoption and her flexible work schedule that would permit her to take Lasa to and from school without the need for after-school care, we conclude that it is in Lasa's best interest to designate Mother as primary residential parent. We reverse the trial court's designation of Father as primary residential parent and remand to the trial court for entry of a parenting plan consistent with this decision and the plan proposed by Mother at trial, in which Mother is named the primary residential parent and Father is awarded liberal, though not equal, visitation. We recognize, however, that "'[e]vents and lives have not stood still while this custody dispute has been in the courts.'" *Rajendran*, 2020 WL 5551715, at *11 (quoting *Wall*, 2011 WL 2732269, at *26). As such,

> when a trial court is directed to reconsider an issue on remand that involves the circumstances of children and their parents, "the trial court should endeavor to ascertain and give effect to the parties' actual circumstances, which will necessarily change over the course of time, e.g., people remarry, have more children, insurance premiums rise and fall, and child care needs change." Accordingly, the trial court may, in its discretion, consider such additional evidence to insure that any custody order is based on "the parties' actual circumstances."

*Id.* (quoting *Kathryne B.F.*, 2014 WL 992110, at *7).

Mother also challenged on appeal the trial court's decision to grant both parties joint decision-making authority. The final decree simply stated that "the parties shall share decision making authority" without any explanation. Tennessee Code Annotated section 36-6-407(c) provides factors for consideration in making such a determination. In the absence of findings by a trial court, "this Court cannot glean its reason for [its ruling on] decision-making authority nor can we discern whether the trial court considered the Tennessee Code Annotated section 36-6-407(c) factors in reaching its decision." *In re Lennon R.*, No. M2018-00541-COA-R3-JV, 2019 WL 2226007, at *13 (Tenn. Ct. App. May 23, 2019). Accordingly, we vacate the trial court's ruling as to decision-making authority and remand for sufficient findings of fact and conclusions of law with respect to that issue. *See id.*; *see also Rajendran*, 2020 WL 5551715, at *12 ("In light of our decision to remand the parenting plan issue, we believe that the best course of action is to vacate the

- 33 -

decision of the trial court and remand for reconsideration in light of this Court's opinion, the changed parenting plan, section 36-6-407(c), and any changed circumstances that the trial court, in its discretion, chooses to entertain. If the trial court nevertheless finds that joint education decisions remain in the best interest of the child, the trial court is directed to make specific findings of fact in support of that decision.").

Due to the change regarding the designation of primary residential parent, we also vacate the trial court's rulings regarding child support and alimony and remand for redetermination of those issues. *See Anderton v. Anderton*, 988 S.W.2d 675, 679 (Tenn. Ct. App. 1998) ("Child support decisions should precede decisions about spousal support because a spouse's ability to pay spousal support may be directly and significantly influenced by the amount of child support he or she has been ordered to pay."); *see also Holliday v. Holliday*, No. E2023-01494-COA-R3-CV, 2024 WL 4646252, at *16 (Tenn. Ct. App. Oct. 31, 2024) ("[W]e vacate the portion of the trial court's order awarding alimony to Wife and remand the issue of the appropriate amount of alimony to be awarded once Husband's child support obligation has been recalculated."). Thus, we do not reach the issues presented on appeal by Mother regarding the trial court's alimony award and award of attorney fees.

Finally, Mother requests an award of her attorney fees on appeal pursuant to Tennessee Code Annotated section 36-5-103(c). "Tennessee Code Annotated section 36-5-103(c) allows this Court, in its discretion, to award attorney's fees 'in regard to any suit or action concerning the adjudication of the custody ... of any child[.]'" *Cali v. Cali*, No. W2024-00773-COA-R3-CV, 2025 WL 3474133, at *16 (Tenn. Ct. App. Dec. 3, 2025).

> In cases involving the custody and support of children, it has long been the rule in this State that counsel fees incurred on behalf of minors may be recovered when shown to be reasonable and appropriate. Although there is no absolute right to such fees, their award in custody and support proceedings is familiar and almost commonplace. In awarding attorney's fees pursuant to section 36-5-103(c), the trial court may consider proof of inability to pay, but such consideration will not be controlling.

*In re Gabby G.*, No. M2024-00541-COA-R3-JV, 2025 WL 2335851, at *15 (Tenn. Ct. App. Aug. 13, 2025) (quoting *Taylor v. Fezell*, 158 S.W.3d 352, 360 (Tenn. 2005)). Given the purpose of the statute, Mother's success on appeal, and the parties' financial circumstances, we exercise our discretion to grant her request for an award of reasonable attorney fees on appeal. This case is remanded to the circuit court to determine the appropriate amount of attorney fees to be awarded.

## IV. CONCLUSION

For the aforementioned reasons, the decision of the circuit court is hereby reversed

in part, vacated in part, and remanded. Costs of this appeal are taxed to the appellee, Joshua Matthew Brown, for which execution may issue if necessary.

s/ Carma Dennis McGee
CARMA DENNIS MCGEE, JUDGE